UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| HOSSEIN MAKARIAN,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>　　　　　　Defendant. | No. CV 12-10866-PLA<br><br><br>**MEMORANDUM OPINION AND ORDER** |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on January 2, 2013, seeking review of the Commissioner's denial of his application for Disability Insurance Benefits. The parties filed Consents to proceed before the undersigned Magistrate Judge on January 29, 2013, and January 30, 2013. Pursuant to the Court's Order, the parties filed a Joint Stipulation on March 7, 2014, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on April 23, 1970. [Administrative Record ("AR") at 29, 129.] He completed two years of college and has past relevant work experience as a delivery route truck driver, pizza deliverer, hand packager, cable TV installer, semi truck driver, and machine cleaner. [AR at 29, 58-66, 153.]

On January 26, 2011, plaintiff filed an application for Disability Insurance Benefits, alleging that he has been unable to work since December 14, 2005. [AR at 20, 129.] After his application was denied initially, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 20, 70, 76-79.] A hearing was held on September 22, 2011, at which time plaintiff appeared with counsel and testified. [AR at 37-58.] A vocational expert ("VE") also testified. [AR at 37, 64-69.] On October 6, 2011, the ALJ issued a decision concluding that plaintiff was not disabled. [AR at 20-30.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 15.] When the Appeals Council denied plaintiff's request for review on October 17, 2012, the ALJ's decision became the final decision of the Commissioner. [AR at 1-5]; see Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam). This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010).

"Substantial evidence means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (internal quotation marks and citation omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same). When determining whether substantial evidence exists to support the

Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (internal quotation marks and citation omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.'").

## IV.
## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

**A.    THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires

1  the Commissioner to determine whether the impairment or combination of impairments meets or
2  equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404,
3  Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id.
4  If the claimant's impairment or combination of impairments does not meet or equal an impairment
5  in the Listing, the fourth step requires the Commissioner to determine whether the claimant has
6  sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled
7  and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform
8  past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie
9  case of disability is established. The Commissioner then bears the burden of establishing that
10 the claimant is not disabled, because he can perform other substantial gainful work available in
11 the national economy. The determination of this issue comprises the fifth and final step in the
12 sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966
13 F.2d at 1257.

**B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ found that plaintiff "did not engage in substantial gainful activity during the period from his alleged onset date of December 14, 2005 through his date last insured of December 31, 2009." [AR at 22 (citation and bold omitted).] At step two, the ALJ concluded that plaintiff has the severe impairments of lumbar degenerative disc disease, a chronic pain disorder, and unspecified depressive and anxiety-related disorders. [Id.] At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listings.[1] [AR at 22-23.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[2] through his date last insured

---

[1]   See 20 C.F.R. pt. 404, subpt. P, app. 1.

[2]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, (continued...)

to perform light work as defined in 20 C.F.R. § 404.1567(b),[3] "but he was restricted to work involving only simple, routine tasks, and only occasional contact with others." [AR at 23.] At step four, based on plaintiff's RFC and the VE's testimony, the ALJ concluded that plaintiff is unable to perform any past relevant work. [AR at 29.] At step five, based on plaintiff's RFC, vocational factors and the VE's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff could perform, including work as a newspaper carrier and coin machine collector. [AR at 29-30.] Accordingly, the ALJ determined that plaintiff was not disabled at any time from December 14, 2005, the alleged onset date, through December 31, 2009, the date last insured. [AR at 20, 30.]

## V.

## **THE ALJ'S DECISION**

Plaintiff contends that the ALJ: (1) erred in rejecting the opinion of plaintiff's treating psychiatrist, Dr. Glass; (2) erred in rejecting plaintiff's subjective allegations; and (3) erred in determining plaintiff's RFC. [Joint Stipulation ("JS") at 3-25, 28-37, 40-46.]

**A.  EVALUATION OF THE MEDICAL EVIDENCE**

Plaintiff contends that the ALJ's rejection of the opinion of plaintiff's treating psychiatrist, Dr. Glass, is not supported by substantial evidence. [JS at 3-25, 28-30.]

---

[2](...continued)
1151 n.2 (9th Cir. 2007).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b) & 416.967(b).

### 1. Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527, 416.902, 416.927. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan, 528 F.3d at 1198.

"[T]he ALJ may only reject a[n] . . . examining physician's uncontradicted medical opinion based on clear and convincing reasons." Carmickle, 533 F.3d at 1164 (internal quotation marks and citation omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Carmickle, 533 F.3d at 1164 (internal quotation marks and citation omitted); Ryan, 528 F.3d at 1198. The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157 F.3d at 725. The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct." Id.

### 2. Relevant Medical Evidence -- Physical

On July 5, 2007, plaintiff had a consult with a spine surgeon, Dr. Ganocy, and Dr. Ganocy indicated that plaintiff was "convinced that surgery will help his symptoms" including, back pain that radiates down into his calves. [AR at 260-61.] He indicated that plaintiff's previous treatment had included chiropractic, physical therapy and epidural injections. [AR at 261.] Based on plaintiff's MRI results, Dr. Ganocy diagnosed symptomatic degenerative spondylosis L3-S1 and stated that it was "unclear" whether surgery would relieve plaintiff's symptoms and he was "hesitant to do 3 level fusion for low back pain in a 37 [year old] male, [because he] would almost certainly require additional surgery proximally in the future." [Id.] Plaintiff consulted with another

spine surgeon, Dr. Parks, on August 9, 2007, who also opined that surgery was not recommended based on plaintiff's MRI results. [AR at 254-57.] Finally, plaintiff returned to Dr. Ganocy on October 19, 2007, for discogram results and Dr. Ganocy stated again that "surgery is not a good option" and noted that plaintiff "continued to insist that he needed the surgery." [AR at 251.]

Plaintiff treated with Dr. Kibrick, a psychologist, at the Outpatient Pain Management Program from August 7, 2007, to February 2, 2010. [See AR at 262-306.] Dr. Kibrick repeatedly noted that, despite treatment, plaintiff did not experience any improvement in his reported symptoms of pain and continued to exhibit depression, anxiety and obsessive behavior. [See, e.g., AR at 263, 268, 271, 274, 277, 280, 284, 287, 290, 293, 296, 301.] Dr. Kibrick also indicated on numerous occasions that he reviewed "all of [plaintiff's] prior consultations . . . including x-rays, MRIs, and other tests -- all are mostly normal, no physical indications for his severe ongoing pain." [See, e.g., AR at 268, 271, 275, 278, 281, 285, 288, 291.]

Plaintiff also treated with Dr. Ching at the Outpatient Pain Management Program from July 14, 2008, to October 3, 2008. [See AR at 240-50.] During this period, Dr. Ching treated plaintiff with several epidural and trigger point injections, but plaintiff reported no relief from these procedures. [Id.] Dr. Ching also noted that plaintiff had undergone "extensive physical therapy and acupuncture [with other providers] without benefit." [AR at 241.] Ultimately, Dr. Ching diagnosed chronic low back and bilateral leg pain and a history of L4-5 and L5-S1 disc protrusions, but opined that plaintiff's "reported pain severity is disproportionate to objective findings." [Id.] He explained that despite the disc protrusions, he would not pursue more aggressive treatment "in view of his diffuse symptomology, exaggerated pain behavior and suspected secondary gain issues including an open worker's compensation case." [Id.] Finally, Dr. Ching indicated that he did "not recommend the use of opioids on a longterm basis" for plaintiff and dismissed him from the pain program. [Id.]

Plaintiff received orthopedic treatment from Dr. Woodward for back and knee pain from June 11, 2007, to October 1, 2010, including trigger point injections, knee and back braces, medication, physical therapy, and home exercises. [See AR at 328-66.] Dr. Woodward repeatedly indicated that despite plaintiff's subjective complaints of nearly constant pain all over his body, his

7

physical exams were essentially normal and he had no response to any treatment given. [Id.] He also noted that plaintiff was frustrated being sent away from urgent care multiple times and he advised plaintiff that going to urgent care for chronic symptoms would not be beneficial. [AR at 333.] Instead, Dr. Woodward advised plaintiff to follow-up with the pain management program. [Id.] Dr. Woodward eventually diagnosed pain disorder with psychological factors and advised plaintiff that he did "not have much to offer his condition." [AR at 329.]

Plaintiff also repeatedly sought treatment at urgent care during the relevant time period for extreme pain and several physicians expressed doubt about a physical basis for plaintiff's pain. [See AR at 710-61.] As a result, he was repeatedly diagnosed by urgent care physicians with pain disorder with psychological factors and advised to follow-up with mental health and pain management treatment providers. [AR at 707, 712, 720, 726, 728, 740, 742, 744, 746, 751, 757, 759.]

### 3. Relevant Medical Evidence -- Mental

Plaintiff treated with Dr. Glass, a psychiatrist, approximately every other month between August 26, 2008, and February 17, 2009. [See AR at 788-98.] Dr. Glass diagnosed plaintiff with pain disorder, insomnia, anxiety, post traumatic stress disorder, personality disorder and depressive disorder. [AR at 789.] During this time, Dr. Glass also prescribed medication to treat plaintiff's symptoms, including depression, anxiety, insomnia and pain, and referred him to psychotherapy. [See id.; see also AR at 393-94, 398-400, 402-03, 406, 413 (psychotherapy notes).] During his February 17, 2009, visit plaintiff reported that he was living with his sister and brother and that all three of them were attending Pierce College, he was walking everyday and doing some physical therapy, and that he had a girlfriend and some friends. [AR at 792.]

On September 23, 2010, plaintiff returned to Dr. Glass for him to complete a Psychiatric Medical Source Statement generated by plaintiff's attorney to be submitted in support of plaintiff's application for Disability Insurance Benefits. [AR at 814, 816.] In the statement, Dr. Glass indicated that this was the first time he had seen plaintiff in 13 months and that plaintiff's diagnoses include anxiety disorder not otherwise specified; depression not otherwise specified; pain disorder; personality disorder not otherwise specified; degenerative lumbar disc;

hypertension; myofascial pain syndrome; throat pain; irritable bowel; gastrointestinal reflux disease; hypogonadism; fatty liver; and chronic sinusitis. [AR at 814.] He assigned plaintiff a Global Assessment of Functioning ("GAF") score of 50[4] and indicated that his treatment plan includes medication and psychotherapy. [Id.] Dr. Glass also noted that plaintiff appeared "better than 13 months ago[,]" but that his mental illness would interfere with his ability to work everyday because he is "still to anxious and has low stress tolerance." [Id.] Dr. Glass opined that plaintiff is markedly impaired in his ability to relate to co-workers; deal with the public; use judgment; interact with supervisors; function independently; maintain attention; maintain concentration; respond to work changes; perform at a constant pace; attain set limits and standards; direct, control or plan activities of others; understand, remember, follow and carry out detailed instructions; behave in an emotionally stable manner; relate predictably in social situations; demonstrate reliability in work performance and completion of tasks; and attend work on a daily basis. [AR at 816.] He also stated that plaintiff was moderately impaired in his ability to understand, remember, follow and carry out complex instructions. [Id.] Finally, Dr. Glass reported that plaintiff's prognosis is guarded and he has "been impaired for 5 years." [Id.]

On May 31, 2011, plaintiff underwent an Agreed Medical Examination by Drs. Friedman and Ammon in connection with his California Worker's Compensation claim that included a detailed review of his medical records and psychological testing. [See AR at 818-47.] The testing revealed that plaintiff was not malingering his symptoms and "has an obsessional level of somatic concentration that will interfere with treatment participation and rehabilitation." [AR at 837-38.] The testing also showed depressive symptoms, but the doctors' opined that plaintiff's "depression should decrease with a corresponding reduction in pain intensity." [AR at 838.] It also appeared that plaintiff "may be experiencing a sleep disorder." [AR at 840.] Drs. Friedman and Ammon

---

[4] A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 32 (4th ed. 2000). A GAF score in the range of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning (e.g., unable to keep a job). Id.

diagnosed depressive disorder not otherwise specified; pain disorder associated with both psychological factors and a general medical condition; insomnia due to depressive and pain disorders; learning disorder not otherwise specified; and personality disorder not otherwise specified. [AR at 841.] Plaintiff was assigned a GAF score of 48 and found to be "temporarily partially disabled in degrees ranging from slight to moderate to overall moderate while temporarily disabled physically." [AR at 841, 844.] Finally, the doctors opined that further psychotherapy was not likely to be helpful to plaintiff, but he should continue medication management and requires vocational rehabilitation. [AR at 845.]

Plaintiff underwent an Initial Psychological Evaluation for the Chronic Pain Program performed by Dr. Fleishman on June 28, 2011.[5] [See AR at 799-802.] Dr. Fleischman explained that plaintiff "presents with depression, agitation, hopelessness, anxiety, stuttering speech at times, and perseverative thought process at times." [AR at 802.] He opined that "biofeedback would not be effective in managing his multitude of issues" and he would "like to see if [plaintiff's] psychiatric and psychological issues could be better addressed and improved before starting a trial of biofeedback to manage his pain." [Id.] Dr. Fleischman noted that plaintiff "became upset and agitated" when he explained that the time was up for the evaluation and even after bringing plaintiff to his office to see him a second time plaintiff "was unable to comprehend and feel satisfied with [Dr. Fleischman's] responses to his questions." [Id.]

Plaintiff returned to Dr. Glass for a visit on August 25, 2011, and Dr. Glass completed another Psychiatric Medical Source Statement generated by plaintiff's attorney dated September 7, 2011. [AR at 782-84.] Dr. Glass opined that the level of plaintiff's occupational impairments had all either stayed the same or increased in their severity. [See AR at 783.] He also provided that plaintiff's impairment would interfere with his concentration and attention 50% of the workday and he would be unable to maintain productivity, persistence and pace if performing a simple, one or two-step task during an eight hour workday. [AR at 784.] Dr. Glass further stated that plaintiff's

---

[5] In the JS, plaintiff incorrectly states that this exam was performed on October 17, 2008. [See JS at 23.]

impairments interfere with his ability to adapt to changes in routine and learn new procedures or tasks. [Id.] Finally, Dr. Glass provided that plaintiff is markedly nervous and his prognosis is guarded as plaintiff's condition is chronic and has lasted "many years." [Id.]

Two days later, on September 9, 2011, Dr. Glass completed a third Psychiatric Medical Source Statement generated by plaintiff's attorney indicating that plaintiff has a depressive syndrome, anxiety disorder, somatoform disorder, and personality disorder. [AR at 785.] Dr. Glass opined that, collectively, these impairments result in plaintiff having marked restrictions in daily activities, social functioning, difficulties maintaining concentration, persistence and pace, and repeated episodes of decompensation, each of extended duration. [Id.] Dr. Glass commented that plaintiff is "significantly impaired, especially by severe anxiety and somatization." [Id.]

**4.     Analysis**

In his decision the ALJ gave the following reasons for rejecting Dr. Glass's opinion:

> The undersigned assigns little probative weight to [Dr. Glass's opinion] because Dr. Glass expressly acknowledged that he has actually seen [plaintiff] "only once in [the] past 13 months (today)". Indeed, the record shows [plaintiff] self-discontinued psychiatric treatment with Dr. Glass (and, more generally, at Kaiser) in early or mid-2009; and he did not return to see Dr. Glass until September 23, 2010 -- i.e., more than a year later (and 9-10 months after the date last insured). Furthermore, the apparent purpose of [plaintiff]'s return visit to Dr. Glass on this occasion was to ask for completion of the attorney-generated questionnaire at issue (further suggesting that [plaintiff] was seeking medical attention primarily in order to generate evidence of "disability" rather than in a genuine attempt to obtain relief from the allegedly disabling symptoms). The degree of limitation assessed by Dr. Glass is also predominately unsupported by objective clinical abnormalities, and notably at odds with [plaintiff]'s relatively good contemporaneous daily activities . . . . [¶] The same weakness -- i.e., lack of an ongoing treatment relationship and lack of support from the other evidence of record -- also undermine the probative value of more recent attorney-generated questionnaires, which were completed by Dr. Glass a week or two before the hearing in September 2011. Among additional weakness, Dr. Glass assessed [plaintiff] as having had "repeated episodes of decompensation, each of extended duration"; yet, the record shows no evidence [plaintiff] has had any such episodes of decompensation. The probative value of the foregoing assessments is further reduced by the fact that all were provided by Dr. Glass long after [plaintiff]'s date last insured.

[AR at 28 (citations omitted).]

The ALJ gave sufficient legal reasons supported by substantial evidence for assigning little weight to Dr. Glass's opinion. For example, the ALJ noted that Dr. Glass "expressly acknowledged" in his questionnaire dated September 23, 2010, that he had not treated plaintiff

11

in the past 13 months as plaintiff "self-discontinued treatment" with Dr. Glass "in early or mid-2009 and he did not return" until "more than a year later (and 9-10 months after the date last insured)." [AR at 28.]; see Benton v. Barnhart, 331 F.3d 1030, 1038-39 (9th Cir. 2003) (explaining that duration of treatment relationship, frequency of visits and nature of contact relevant in weighing medical opinions); 20 C.F.R. § 404.1527(c)(2)(i) (providing that the longer a treating source has treated a claimant and the more times he/she has been seen by a treating source, the more weight the Commissioner will give to the medical source's opinion).

The ALJ also properly found that Dr. Glass's opinion was entitled to less weight because the apparent purpose of the two most recent visits was not treatment, but to have Dr. Glass complete attorney generated forms in support of plaintiff's application for benefits. [See AR at 28.]; Saelee v. Chater, 94 F.3d 520, 522-23 (9th Cir. 1996) (explaining that although "[t]he purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them," an ALJ may question a doctor's credibility where "the doctor's opinion letter had been solicited by the claimant's counsel.") (internal quotation marks and citations omitted); Burkhart v. Bowen, 856 F.2d 1335, 1339 (9th Cir. 1988) (finding ALJ's rejection of doctor's opinion because, among other things, it was solicited by plaintiff's counsel was "a permissible credibility determination").

Moreover, the ALJ's determination that "[t]he degree of limitation assessed by Dr. Glass is also predominately unsupported by objective clinical abnormalities" [AR at 28], is supported by substantial evidence. For example, while Dr. Glass stated that plaintiff suffered repeated episodes of decompensation, each of extended duration [see AR at 785], there is no evidence of plaintiff ever having suffered any such episodes in the record. [See, generally, AR at 1-847.] Moreover, Dr. Glass's treatment notes mostly reflect plaintiff's subjective complaints and note that he was prescribed various medications [see AR at 788-97], but do not otherwise contain any objective findings to support his opinion that plaintiff suffers marked to extreme limitations. [See AR at 782-97, 814.] Other doctors who treated plaintiff during the relevant time period also repeatedly noted

that the results of plaintiff's objective testing were normal and they were unable to determine the source of his pain.[6]  [See AR at 241, 268, 271, 275, 278, 281, 285, 288, 291, 328-66.]

Additionally, the ALJ properly found that the degree of limitation opined by Dr. Glass was "notably at odds with [plaintiff]'s relatively good contemporaneous daily activities." [See AR at 28.] For example, on February 17, 2009, plaintiff reported to Dr. Glass that he was living with his brother and sister, attending school, exercising, and maintaining relationships with his girlfriend and a few friends. [AR at 792.] Plaintiff also testified at the hearing that he was able to drive a significant distance without difficulty. [AR at 44-45.] Accordingly, it was reasonable for the ALJ to infer that the extreme limitations opined by Dr. Glass were entitled to less weight because they were at odds with plaintiff's reported daily activities. See Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.") (citation omitted).

Finally, while medical opinions offered after the date last insured can be relevant to assessing the level of limitation at an earlier point in time, under the circumstances, the ALJ's finding that the "probative value" of Dr. Glass's September 2011 assessments "is further reduced by the fact that all were provided by Dr. Glass long after [plaintiff]'s date last insured [AR at 28], is supported by substantial evidence. Specifically, considered in conjunction with the other reasons provided by the ALJ, the fact that Dr. Glass's recent assessments were offered nearly two

---

[6] Plaintiff's contention that Dr. Glass's opinion is supported by the opinions of Drs. Fleischman, Friedman, and Ammon [see JS at 23-24, 29], is unpersuasive. As an initial matter, plaintiff incorrectly states that Dr. Fleischman examined plaintiff on October 17, 2008, rather than June 28, 2011, the actual date of the examination. [Compare JS at 23 with AR at 799-802.] In fact, these doctors' opinions were both offered long after plaintiff's date last insured, based on one-visit with plaintiff, and did not claim to represent his condition at an earlier time period. [See AR at 799-802, 818-47.] Moreover, neither contained any of the limitations opined by Dr. Glass. [See id.] In particular, Dr. Fleischman did not specify any limitations but, rather, opined that "biofeedback" treatment was not advisable. [AR at 802.] Moreover, while Drs. Friedman and Ammon diagnosed plaintiff with various mental disorders, they also recommended that he undergo occupational therapy, which supports an inference that they believed he was capable of work. [AR at 841, 845.]

years after plaintiff's date last insured provided additional support for the ALJ's finding that his opinion was entitled to less weight. See Molina, 674 F.3d at 1111.

In sum, the ALJ's rejection of Dr. Glass's opinion is supported by substantial evidence.

**B.    CREDIBILITY**

Plaintiff contends that the ALJ improperly rejected his subjective allegations of pain. [JS at 30-37, 40-42.]

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if the claimant meets the first test, the ALJ may reject the claimant's testimony about the severity of his symptoms "only upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so." Benton, 331 F.3d at 1040. Factors to be considered in weighing a claimant's credibility include: (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and his conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also 20 C.F.R. §§ 404.1529(c), 416.929(c).

Where the ALJ does not find "affirmative evidence" of malingering, the ALJ's reasons for rejecting a claimant's credibility must be clear and convincing. See Benton, 331 F.3d at 1040 (Where there is no evidence of malingering, the ALJ can reject claimant's testimony only by "expressing clear and convincing reasons for doing so."). "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Reddick, 157 F.3d at 722 (internal quotation marks and citation omitted); Berry, 622 F.3d at 1234 (same). The ALJ's findings "must be

14

sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." Bunnell, 947 F.2d at 345-46 (internal quotation marks and citation omitted). A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Bunnell, 947 F.2d at 346. As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

In a Pain and Other Symptoms form dated March 14, 2011, plaintiff indicated that he has constant, severe pain caused by "any physical activity." [AR at 171-72.] Plaintiff reported that he has tried medication, a "TENS unit, acupuncture, epidural injections, muscle injections, massage therapy, [and] elbow therapy[,]" but none of these treatments reduced his pain. [AR at 172.] Plaintiff also explained that his pain makes it difficult for him to communicate, concentrate or sleep. [Id.]

In a Function Report completed the same day, plaintiff stated that pain makes him unable to dress himself, bathe, groom himself, shave, or feed himself without great difficultly. [AR at 173-74; see AR at 175-80.] He is unable to handle money and has problems getting along with others. [AR at 176-77.] Plaintiff further provided that his pain affects his ability to lift, climb stairs, use his hands, bend, understand, stand, kneel, remember, follow instructions, walk, squat, concentrate, sit, read, talk, and complete tasks. [AR at 177.] He can walk for 20 minutes before needing to rest for 5 minutes and can pay attention for only 15 minutes at one time. [Id.] Finally, plaintiff indicated that he gets upset when people do not show him respect and he was fired from a previous job because a "co-worker [made him] angry and disrespected [him so plaintiff] punched him when [he] lost his temper." [AR at 179.]

At the hearing, plaintiff testified that he has been unable to work since December 2005 because of constant pain in his lower back, middle back, upper back, neck, both sides of his body, both legs, both arms and both elbows. [AR at 39-41, 56.] He also stated that he attended Pierce College in 2007 for about two and a half years and obtained a GPA of 2.6 or 2.7, but he stopped attending because he did not have money for tuition and pain made it difficult for him to sit or

1 stand for very long at one time. [AR at 42-44.] According to plaintiff, none of the treatment he has received has reduced his pain and he has had multiple conflicts with treatment providers leading him to file roughly 25 to 35 complaints with the hospital. [AR at 48-52.]

In his decision, the ALJ found plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" [AR at 23], which "satisfie[s] the first prong of the ALJ's inquiry regarding the credibility of [plaintiff]'s complaints." Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009); see also id. ("After finding that Vasquez has a back disorder which is a severe impairment, the ALJ acknowledged that Vasquez's injuries could reasonably be expected to produce *some* of the pain and other symptoms alleged.") (internal quotation marks omitted, italics in original).

The ALJ went on to find, however, that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" assessed RFC. [AR at 23.] Specifically, the ALJ rejected plaintiff's subjective allegations for the following reasons: (1) plaintiff's "description of the severity of his pain has been so extreme as to appear implausible (particularly in light of his relatively normal clinical presentation)"; (2) the medical evidence, including two MRIs, a discogram, and the treatment notes of repeated examinations, all show "little to no objective indication of any impairment"; (3) many physicians opined that plaintiff did not appear in distress and have "suggested the possibility of symptom magnification (or malingering), or otherwise reported similar skepticism concerning [plaintiff]'s subjective complaints of constant and debilitating pain"; (4) despite over 200 hospital or clinic visits plaintiff's "actual medical treatment has been relatively routine and/or conservative in nature"; (5) despite plaintiff's description of debilitating pain, he fails to use an assistive device and his daily activities include driving, shopping, handling his own money, attending college, and maintaining a relationship with a girlfriend and friends; and (6) plaintiff's efforts to get his job back in February 2009 suggest that the reason for his continued unemployment was not solely the severity of his alleged impairments. [AR at 24-27.]

Having carefully reviewed the record, the Court concludes that the ALJ's rejection of plaintiff's credibility is supported by substantial evidence. As an initial matter, the ALJ properly

1  determined that plaintiff was less credible based on the suggestion of several treating physicians
2  that plaintiff was possibility magnifying or malingering his symptoms. [AR at 25; see AR at 250,
3  335, 714]; Carmickle, 533 F.3d at1160 n. 1 (providing that an ALJ may reject a plaintiff's credibility
4  based upon a finding of malingering); Benton, 331 F.3d at 1040 (same).

5  Moreover, the ALJ also provided clear and convincing reasons for rejecting plaintiff's
6  subjective allegations. First, the ALJ found that while plaintiff claimed to experience constant pain,
7  he "consistently failed to provide convincing details regarding factors which precipitate the
8  allegedly disabling pain[.]" [AR at 24.] It was reasonable for the ALJ to infer that plaintiff's inability
9  to describe any nuances of his pain or what triggers his pain undermined his allegations. See
10 Molina, 674 F.3d at 1112 ("In evaluating the claimant's testimony, the ALJ may use ordinary
11 techniques of credibility evaluation.") (internal quotation marks and citation omitted).

12 Second, the ALJ's finding that plaintiff's allegations of constant, debilitating pain were
13 undermined by a lack of objective medical evidence [AR at 24], is supported by substantial
14 evidence. While a lack of objective medical evidence supporting a plaintiff's subjective complaints
15 cannot provide the only basis to reject a claimant's credibility (see Light v. Soc. Sec. Admin., 119
16 F.3d 789, 792 (9th Cir. 1997)), it is one factor that an ALJ can consider in evaluating symptom
17 testimony. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical
18 evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can
19 consider in his credibility analysis."); accord Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.
20 2001). Here, as noted by the ALJ, two MRIs and a lumbar discogram of plaintiff's back were
21 "essentially unremarkable" apart from mild to moderate degenerative changes and plaintiff's
22 "clinical presentation has remained relatively normal." [AR at 24; see AR at 240-41, 245, 247-50,
23 264, 335, 491, 497, 557]; see also Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995) (upholding
24 adverse credibility finding because "numerous medical examinations failed to disclose any
25 underlying medical cause of the ailments of which [plaintiff] complained," and "[plaintiff]'s conduct
26 also raised doubts about the integrity of her complaints").

27 Third, the ALJ found that despite hundreds of hospital and clinic visits to treat his
28 symptoms, plaintiff's actual treatment has been relatively routine and conservative and no

physician recommended spine surgery or other surgical interventions. [AR at 26]; see Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (explaining that conservative treatment can suggest a lower level of both pain and functional limitation, justifying adverse credibility determination). While plaintiff apparently concedes that he received only conservative treatment for his complaints of constant body pain, he argues that "this is a psychiatric claim[.]" [JS at 41; see JS at 35, 40.] Clearly, physical and mental impairments are not mutually exclusive, but plaintiff's effort to recast his claim as solely "psychiatric" despite initially contending that a back injury at work in 2005 led to his inability to work [see, e.g., AR at 737 (noting plaintiff's indication that he has been "disabled" since an injury at work in 2005); 819 (detailing that the history of plaintiff's injury began with an injury to his back and legs at work)], is unavailing.

Fourth, the ALJ's finding that plaintiff's subjective allegations of pain were undermined by the fact that plaintiff did not require an assistive device for ambulation and was able to engage in a wide-range of daily activities [see AR at 27], is supported by substantial evidence. In particular, the ALJ noted that plaintiff

> has acknowledged being able to go outside and travel independently, walk continuously for 20 minutes, drive a car, shop in stores for food and personal items, and pay bills and otherwise handle money. A review of the treatment records further reveals that in the year prior to the date last insured, [plaintiff] reportedly was living with his brother and sister, spending a good deal of time with his girlfriend, maintaining relationships with a few other friends, going to school, and collecting worker's compensation benefits. . . . [Plaintiff also] acknowledged at the hearing that he was able to drive his car a considerable distance (from Van Nuys to West Los Angeles) without difficultly, and that he generally has no problems navigating the busy streets and following the rules of the road. The foregoing is at odds with what one might reasonably expect, given [plaintiff]'s complaints of constant, debilitating pain since the alleged onset date.

[Id. (citations omitted)]; see Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (explaining that a plaintiff's allegations can be rejected upon a finding that plaintiff is "able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting"); Burch, 400 F.3d at 681 ("if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities[]").

Finally, the ALJ properly rejected plaintiff's subjective allegations based on evidence that he may have tried to get his job back, but discovered that it was terminated. [AR at 27; see AR at 737.] It was reasonable for the ALJ to infer that if plaintiff was trying to go back to his old job years after his alleged onset date, he was likely not as impaired as alleged.

In sum, the ALJ's rejection of plaintiff's subjective pain allegations is supported by substantial evidence.[7]

## VI.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for reversal, or in the alternative, remand, is **denied**; (2) the decision of the Commissioner is **affirmed**; and (3) the Clerk of the Court shall serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: May 30, 2014

/s/ Paul L. Abrams
_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[7] In light of the Court's decision, it is not necessary to reach plaintiff's remaining contention that the ALJ erred in assessing plaintiff's RFC because he failed to incorporate the limitation opined by Dr. Glass. [See JS at 42-46.]